DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. THOMAS AND ST. JOHN

```
UNITED STEEL, PAPER & FORESTRY,        )
RUBBER, MANUFACTURING, ALLIED          )
INDUSTRIAL AND SERVICE WORKERS         )
INTERNATIONAL UNION AFL-CIO-CLC,       )
                                       )
              Plaintiff,               )
                                       )
        v.                             )    Civil No. 2011-76
                                       )
GOVERNMENT OF THE UNITED STATES        )
VIRGIN ISLANDS, GOVERNOR JOHN P. DE    )
JONGH, JR., FINANCE COMMISSIONER       )
ANGEL DAWSON, and DIRECTOR OF          )
MANAGEMENT AND BUDGET DEBRA GOTTLIEB,  )
                                       )
              Defendants.              )
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ )
                                       )
AMERICAN FEDERATION OF TEACHERS,       )
LOCAL 1825, VIRGIN ISLANDS STATE       )
NURSES ASSOCIATION-CBU, and UNITED     )
INDUSTRIAL, SERVICE, and PROFESSIONAL  )
AND GOVERNMENT WORKERS OF NORTH        )
AMERICA, SEAFARERS INTERNATIONAL       )
UNION OF NORTH AMERICA,                )
                                       )
              Plaintiffs,              )
                                       )
        v.                             )    Civil No. 2011-77
                                       )
GOVERNMENT OF THE VIRGIN ISLANDS, and  )
JOHN P. DE JONGH, JR.,                 )
                                       )
              Defendants.              )
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ )
                                       )
POLICE BENEVOLENT ASSOCIATION LOCAL    )
1910, ST. CROIX CHAPTER, LAW           )
ENFORCEMENT SUPERVISORS UNION LOCAL    )
119, ST. CROIX CHAPTER, ARTHUR A.      )
JOSEPH, SR., as president of Police    )
Benevolent Association, St.Croix       )
Chapter, and FREDDY ORTIZ, JR., as     )
president of Law Enforcement           )
```

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 2

Supervisors Union, St. Croix Chapter, )
                                      )
             Plaintiffs,              )
                                      )
        v.                            )   Civil No. 2011-78
                                      )
GOVERNMENT OF THE VIRGIN ISLANDS,     )
GOVERNOR JOHN P. DE JONGH, JR., in    )
his official capacity as Governor of  )
the Virgin Islands, VIRGIN ISLANDS    )
POLICE DEPARTMENT, DEBRA GOTTLIEB,    )
in her official capacity as DIRECTOR  )
OF THE VIRGIN ISLANDS OFFICE OF       )
MANAGEMENT AND BUDGET, and            )
LEGISLATURE OF THE VIRGIN ISLANDS,    )
                                      )
             Defendants.              )
──────────────────────────────────── )
ST. CROIX FEDERATION OF TEACHERS,     )
LOCAL 1826, and ROSA SOTO-THOMAS, in  )
her official capacity as 1st Vice      )
President of AFT Local 1826 and on    )
behalf of all members of AFT Local    )
1826,                                 )
                                      )
             Plaintiffs,              )
                                      )
        v.                            )   Civil No. 2011-79
                                      )
GOVERNMENT OF THE VIRGIN ISLANDS,     )
GOVERNOR JOHN P. DE JONGH, JR., in    )
his official capacity as Governor of  )
the U.S. Virgin Islands, ANGEL        )
DAWSON, in his official capacity as   )
COMMISSIONER OF FINANCE, VIRGIN       )
ISLANDS DEPARTMENT OF EDUCATION, 29th )
LEGISLATURE OF THE VIRGIN ISLANDS,    )
and DEBRA GOTTLIEB, in her official   )
capacity as DIRECTOR OF THE VIRGIN    )
ISLANDS OFFICE OF MANAGEMENT AND      )
BUDGET,                               )
                                      )
             Defendants.              )
──────────────────────────────────── )

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 3

**Michael J. Sanford, Esq.**
Sanford, Amerling & Associates
St. Croix, VI
**Richard P. Rouco, Esq.**
**Robert Moore Weaver, Esq.**
Quinn, Connor, Weaver, Davies & Rouco
Birmingham, AL
　　*For the plaintiff United Steel, Paper & Forestry, Rubber,*
　　*Manufacturing, Allied Industrial and Service Workers*
　　*International Union AFL-CIO-CLC,*

**Pedro K. Williams, Esq.**
Law Office of Frazer and Williams
St. Thomas, VI
　　*For the plaintiffs American Federation of Teachers, Local*
　　*1825; Virgin Islands State Nurses Association-CBU; and*
　　*United Industrial, Service, and Professional and Government*
　　*Workers of North America, Seafarers International Union of*
　　*North America,*

**Nizar A. Dewood, Esq.**
The Dewood Law Firm
St. Croix, VI
　　*For the plaintiffs Police Benevolent Association Local*
　　*1910, St. Croix Chapter; Law Enforcement Supervisors Union*
　　*Local 119, St. Croix Chapter; Arthur A. Joseph, Sr.,*
　　*President Of Police Benevolent Association, St.Croix*
　　*Chapter; and Freddy Ortiz, Jr., President Of Law*
　　*Enforcement Supervisors Union, St. Croix Chapter,*

**Emile A. Henderson, III, Esq.**
Law Office of Ross-Edwards and Henderson, LLP
St. Croix, VI
　　*For the plaintiffs St. Croix Federation of Teachers, Local*
　　*1826; and Rosa Soto-Thomas, First Vice President of AFT*
　　*Local 1826,*

**Robert A. Molloy, Esq.**
**Sigrid M. Tejo-Sprotte, Esq.**
Office of Collective Bargaining
St. Thomas, VI
**G. Alan Teague, Esq.**
Law Office of G. Alan Teague, P.C.
St. Thomas, VI
　　*For the defendants Government of the Virgin Islands;*
　　*Governor John P. De Jongh, Jr.; Angel Dawson, Finance*

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 4

      *Commissioner; Debra Gottlieb, Director of Management and*
      *Budget,*

**Trudy Fenster, Esq.**
Legislature of the Virgin Islands
      *For the defendant Legislature of the Virgin Islands.*

**MEMORANDUM OPINION**

**GÓMEZ, C.J.**

      On June 22, 2011, the Legislature of the Virgin Islands

(the "Legislature") adopted Bill No. 29-0123, the Virgin Islands

Economic Stability Act ("VIESA"). VIESA became law on July 5,

2011, by signature of the Governor of the Virgin Islands, John

P. de Jongh, Jr. ("Governor de Jongh"), as Act No. 7261. VIESA

provided, among other things, that all employees of the

Executive and Legislative Branches of the Government of the

Virgin Islands making more than $26,000 a year in salary would

receive an eight percent reduction in pay.

      Thereafter, the plaintiffs initiated this action. Plaintiff

United Steel, Paper & Forestry, Rubber, Manufacturing, Allied

Industrial and Service Workers International Union, AFL-CIO-CLC

("USW"), asserts six counts in its Complaint. Counts I, II, and

III allege that VIESA violates the Impairment-of-Contracts

Clauses in the federal Constitution and the Virgin Islands

Revised Organic Act.[1] Count IV alleges that VIESA violates Title

---

[1] Count I asserts a claim arising under Title Forty-Two, Section 1983 of
the United States Code against the individual defendants for violating the

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 5

Forty-Two, Section 1983 of the United States Code by interfering with the right to engage in collective bargaining. Count V alleges that VIESA violates the Equal Protection Clauses of the federal Constitution and the Virgin Islands Revised Organic Act. Count VI seeks injunctive relief barring the enforcement of VIESA. USW subsequently dismissed Counts IV and V pursuant to Federal Rule of Civil Procedure 41(a)(2).

Plaintiffs American Federation of Teachers, Local 1825; Virgin Islands State Nurses Association-CBU; and United Industrial, Service and Professional and Government Workers of North America, Seafarers International Union of North America assert four counts in their Complaint. Count I alleges a violation of the Impairment-of-Contracts Clauses of the federal Constitution and the Virgin Islands Revised Organic Act. Count II alleges that VIESA constitutes a taking in violation of the Takings Clauses of the Fifth Amendment and of the Virgin Islands Revised Organic Act. Count III alleges that VIESA violates Title Twenty-Four, Sections 373(a) and 378(a)(8) of the Virgin Islands Code. Count IV alleges that the enactment of VIESA constitutes a breach of the duty of good faith and fair dealing.

---

Impairment-of-Contracts Clauses. Count II asserts a claim against the Government of the Virgin Islands itself for violating the Impairment-of-Contracts Clauses. Count III seeks a declaratory judgment that VIESA violates the Impairment-of-Contracts Clauses.

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 6

Plaintiffs Police Benevolent Association Local 1910, St.
Croix Chapter; Law Enforcement Supervisors Union Local 119, St.
Croix Chapter; Arthur A. Joseph, Sr., President of Police
Benevolent Association, St. Croix Chapter; and Freddy Ortiz,
Jr., President Of Law Enforcement Supervisors Union, St. Croix
Chapter, assert three counts in their Complaint. Count I alleges
a violation of the Impairment-of-Contracts Clauses of the
federal Constitution and the Virgin Islands Revised Organic Act.
Count II alleges that VIESA violates the Due Process Clauses of
the Fourteenth Amendment and the Virgin Islands Revised Organic
Act. Count III alleges that VIESA violates the separation-of-
powers doctrine under Title Two, Sections Twenty and Twenty-One
of the Virgin Islands Code.

Plaintiffs St. Croix Federation of Teachers, Local 1826,
and Rosa Soto-Thomas, First Vice President of Local 1826, assert
five counts in their Complaint. Count I alleges a violation of
the Impairment-of-Contracts Clauses of the federal Constitution
and the Virgin Islands Revised Organic Act. Count II alleges
that VIESA violates the Due Process and Takings Clauses of the
federal Constitution and the Virgin Islands Revised Organic Act.
Count III alleges that the enactment of VIESA constitutes a
breach of contract. Count IV alleges that VIESA violates the
separation-of-powers doctrine under Title Two, Sections Twenty
and Twenty-One of the Virgin Islands Code. Count V alleges that

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 7

the enactment of VIESA constitutes a breach of the duty of good faith and fair dealing.

On December 5, 2011, the Court held a trial without a jury. What follows is the Court's findings of fact and conclusions of law.

## I.   FINDINGS OF FACT

### A.   The Collective Bargaining Agreements

> **i.   United Steel, Paper and Forestry, Rubber, Manufacturing, Allied Industrial and Service Workers International Union AFL-CIO-CLC**

1.   The United Steel, Paper and Forestry, Rubber, Manufacturing, Allied Industrial and Service Workers International Union AFL-CIO-CLC ("USW") is a collective-bargaining representative for approximately 1,000 employees of the Government of the Virgin Islands (the "Government"). (Tr. at 75-76.)

2.   The USW, on behalf of all of its member employees, entered into a master collective bargaining agreement with the Government. (the "USW Master CBA") (collectively, the "USW CBAs"). (Pls.' Jt. Ex. 24.) The USW Master CBA has an effective date of October 1, 2009, and is set to expire on September 30, 2013. (Pls.' Jt. Ex. 24 at 1.)

3.   On behalf of supervisory employees, members of Locals 9488 and 9489, the USW entered into a collective bargaining agreement with the Government. (the "USW Supervisors CBA").

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 8

(Pls.' Jt. Ex. 26.) The USW Supervisors CBA came into effect on October 1, 2005 and was set to expire on September 30, 2008. (Pls.' Jt. Ex. 26 at 63.). However, it has been extended by the parties on a day-to-day basis and remains in effect. (Tr. 81, 91; Ex. 26 at 63.)

4.    On behalf of non-supervisory employees, members of Locals 8248 and 8249, the USW entered into a collective bargaining agreement with the Government (the "USW Non-Supervisors CBA"). (Pls.' Jt. Ex. 25.) The USW Non-Supervisors CBA has an effective date of October 1, 2009, and is set to expire on September 30, 2013. (Pls. Jt. Ex. 25 at 78.)

5.    On behalf of enforcement officers, members of Locals 8248 and 8249, the USW entered into a collective bargaining agreement with the Government. (the "Enforcement Officers CBA"). (Ex. 23.) The USW Enforcement-Officers CBA has an effective date of October 1, 2009, and is set to expire on September 30, 2012. (Ex. 23 at 49.)

6.    All of the USW CBAs set forth detailed payment plans specifying the payment of wages or salaries and benefits for all employees covered by the agreements. (Tr. at 81; Pls.' Jt. Ex. 26 at Apps. A, C; Pls.' Jt. Ex. 24 at 5-77; Pls.' Jt. Ex. 25 at App. A; Pls.' Jt. Ex. 23 at 51.)

7.    The USW Supervisors CBA, the USW Non-Supervisors CBA, and the USW Enforcement Officers CBA all provide that the

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 9

Government may reduce the work force through layoffs and set

forth the procedures by which the Government may layoff and

rehire USW member employees. (Pls.' Jt. Ex. 26 at 32-33; Pls.'

Jt. Ex. 25 at 19; Pls.' Jt. Ex. 23 at 15.)

    8.   The USW Supervisors CBA, the USW Non-Supervisors CBA,

and the USW Enforcement Officers CBA all contain a severance

clause, which provides that should any provision of the CBAs

conflict with Virgin Islands law it would be deemed inoperative.

The remainder of the CBAs would still be in effect. (Pls.' Jt.

Ex. 26 at 57.; Pls.' Jt. Ex. 25 at 54; Pls.' Jt. Ex 23 at 43.)

    9.   The USW Supervisors CBA the USW Non-Supervisors CBA,

and the USW Enforcement Officers CBA all provide that member

employees will not strike during the duration of the agreement.

(Pls.' Jt. Ex. 26 at 59; Pls.' Jt. Ex. 23 at 42; Pls.' Jt. Ex.

25 at 55.)

    10.  The USW Supervisors CBA, the USW Non-Supervisors CBA,

and the USW Enforcement Officers CBA set forth grievance and

arbitration procedures that allow for either the USW or its

members to adjudicate any dispute involving the interpretation,

violation, application, or performance of the CBAs. (Pls.' Jt.

Ex. 26 at 35-41;Pls.' Jt. Ex. 23 at 7-10;Pls.' Jt. Ex. 25 at 8-

13.)

    11.  The USW Enforcement Officers CBA also includes an

integration clause, which provides that no term of the CBA may

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 10

be modified unless agreed to in writing by the Government and

the USW. (Pls.' Jt. Ex. 23 at 44.)

### ii.  American Federation of Teachers

12.  The American Federation of Teachers ("AFT") is the

collective-bargaining representative for educational

professionals (the "AFT Professionals CBA"), paraprofessionals

(the AFT Paraprofessionals CBA"), and support staff (the AFT

Support Staff CBA) employed by the Government of the Virgin

Islands. (Pls.' Jt. Ex. 16.)

13.  The AFT, on behalf of Locals 1825 and 1826, entered

into three collective bargaining agreements with the Government:

one for professionals, one for paraprofessionals, and one for

support staff (collectively, the "AFT CBAs"). (Tr. at 32, Pls.'

Jt. Ex. 16.)

14.  All of the AFT CBAs came into effect on September 1,

2007. All were set to expire on August 31, 2011. However, they

have been extended by the parties on a day-to-day basis. (Tr. at

32.)

15.  All of the AFT CBAs set forth detailed payment plans

for wages or salaries and benefits for each class of AFT-member

employees of the Government. (Pls.' Jt. Ex. 16 at 2, 6, 11, 17,

25-27.)

16.  All of the AFT CBAs contain identical severance

clauses, providing that should any provision conflict with

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 11

Virgin Islands law it would be deemed inoperative. The remainder of the CBA would still be in effect. (Pls.' Jt. Ex. 16 at 3.)

17. All of the AFT CBAs contain identical integration clauses, providing that any modification to the CBAs had to be agreed to by all parties in writing. (Pls.' Jt. Ex. 16 at 16, 24.)

18. All of the AFT CBAs provide that the employees will not strike for the duration of the agreement. (Pls.' Jt. Ex. 16, AFT Professionals CBA at pg. 8; AFT Paraprofessionals CBA at pg. 40; AFT Support Staff CBA at pg. 49.)

19. All of the AFT CBAS set forth grievance and arbitration procedures that allow for either the AFT or its members to adjudicate any dispute involving the interpretation, violation, application, or performance of the CBAs. (Pls.' Jt. Ex. 16, AFT Professionals CBA at pp. 13-16; AFT Paraprofessionals CBA at pp. 8-12; AFT Support Staff CBA at pp. 11-14.)

### iii. Virgin Islands State Nurses Association-Collective Bargaining Unit

20. The Virgin Islands State Nurses Association-Collective Bargaining Unit ("VISNA-CBU") is the collective-bargaining representative for nurses and other healthcare professionals employed by the Government of the Virgin Islands. (Pls.' Jt. Ex. 17.)

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 12

21.  VISNA-CBU and the Government entered into a collective bargaining agreement (the "VISNA-CBU CBA"). (Pls.' Jt. Ex. 17.)

22.  The VISNA-CBU CBA came into effect on October 1, 2006, and was set to expire on September 30, 2009. (Pls.' Jt. Ex. 17 at 55.) However, it has been extended on a day-to-day basis by the parties. (Tr. at 32.)

23.  The VISNA-CBU CBA outlines a detailed salary and benefits plan for all VISNA-member employees of the Government. (Pls.' Jt. Ex. 17 at 42–45.)

24.  The VISNA-CBU CBA provides that the Government may reduce the work force through layoffs and sets forth the procedures by which the Government may layoff and rehire VISNA-member employees. (Pls.' Jt. Ex. 17 at 31.)

25.  The VISNA-CBU CBA includes a severance clause which provides that should any provision conflict with Virgin Islands law it would be deemed inoperative, but the remainder of the CBA would still be in effect. (Pls.' Jt. Ex. 17 at 54.)

26.  The VISNA-CBU CBA contains an integration clause which provides that any modification to the CBA must be agreed to by all parties in writing. (Pls.' Jt. Ex. 17 at 53.)

27.  The VISNA-CBU CBA also provides that the employees will not strike for the duration of the agreement. (Pls.' Jt. Ex. 17 at 51.)

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 13

28.  The VISNA-CBU CBA sets forth grievance and arbitration
procedures that allow for either the VISNA-CBU or its members to
adjudicate any dispute involving the interpretation, violation,
application, or performance of the CBAs. (Pls.' Jt. Ex. 17 at
46-50.)

### iv.  United Industrial, Service, Professional and Government Workers of North America, Seafarers International Union of North America

29.  The United Industrial, Service, Professional and
Government Workers of North America, Seafarers International
Union of North America ("UIW-SIU") is the collective-bargaining
representative for assistant attorneys general and corrections
officers employed by the Government of the Virgin Islands.
(Pls.' Jt. Ex. 17.)

30.  The UIW-SIU, on behalf of all of its member employees,
and the Government are parties to a master collective bargaining
agreement (the "UIW-SIU Master CBA"). (Pls.' Jt. Ex. 28.) The
UIW-SIU Master CBA came into effect on October 1, 2005. It was
set to expire on September 30, 2008. (Pls.' Jt. Ex. 28 at 90.)
However, it has been extended by the parties on a day-to-day
basis and remains in full effect. (Tr. at 59.)

31.  UIW-SIU, on behalf of assistant attorneys general, and
the Government are parties to a collective bargaining agreement
(the "Attorneys General CBA"). (Pls.' Jt. Ex. 19.) The Attorneys
General CBA came into effect on October 1, 2007, and was set to

expire September 30, 2011. (Pls.' Jt. Ex. 19 at 40.) However, it
has been extended by the parties on a day-to-day basis and
remains in full effect. (Tr. at 59.)

32.   UIW-SIU, on behalf of corrections officers, and the
Government are parties to a collective bargaining agreement (the
"Corrections Officers CBA"). (Pls.' Jt. Ex. 18.) The Corrections
Officers CBA came into effect on October 1, 2001, and was set to
expire on September 30, 2005. (Pls.' Jt. Ex. 18 at 61.) However,
it has been extended by the parties on a day-to-day basis and
remains in full effect. (Tr. at 302.)

33.   All of the UIW-SIU CBAs set forth in detail payment
plans for the wages or salaries and benefits of UIW-SIU-member
employees. (Tr. at 35, 71-72; Pls.' Jt. Ex. 18 at 42-44; Pls.'
Jt. Ex. 19 at 37-38; Pls.' Jt. Ex. 28 at App.)

34.   The UIW-SIU Master CBA and the Corrections Officers
CBA both provide that the Government may reduce the work force
through layoffs and sets forth the procedures by which the
Government may layoff and rehire UIW-SIU-member employees.
(Pls.' Jt. Ex. 18 at 18-21; Pls.' Jt. Ex. 28 at 18-21.)

35.   The UIW-SIU Master CBA and the Corrections Officers
CBA both contain a severance clause which provides that should
any provision conflict with Virgin Islands law it would be
deemed inoperative. The remainder of the CBA would still be in
effect. (Pls.' Jt. Ex. 18 at 60; Pls.' Jt. Ex. 28 at 88.)

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 15

36.   The UIW-SIU Master CBA and the Attorneys General CBA
both contain an integration clause which provides that any
modification to the CBA must be agreed to by all parties in
writing. (Pls.' Jt. Ex. 19 at 41; Pls.' Jt. Ex. 28 at 89.)

37.   The Attorneys General CBA waived the right of
attorneys general to negotiate for salary increases for the
period beginning on October 1, 2006, and continuing through
September 30, 2007. (Pls.' Jt. Ex. 19 at 40.)

38.   The UIW-SIU Master CBA and the Corrections Officers
CBA both provide that the employees shall not strike for the
duration of the agreements. (Pls.' Jt. Ex. 28 at 86; Pls.' Jt.
Ex. 18 at 59.)

39.   The UIW-SIU Master CBA and the Corrections Officers
CBA both set forth grievance and arbitration procedures that
allow for either the UIW-SIU or its members to adjudicate any
dispute involving the interpretation, violation, application, or
performance of the CBAs. (Pls.' Jt. Ex. 28 at 22-26; Pls.' Jt.
Ex. 18 at 22-26.)

**v.   Virgin Islands Police Benevolent Association and Law
Enforcement Supervisors Union**

40.   The Virgin Islands Police Benevolent Association
("PBA") is the collective-bargaining representative for police
and other law-enforcement employees in non-supervisory
positions. The Law Enforcement Supervisors Union ("LESU") is the

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 16

collective-bargaining representative for police and other law-enforcement employees in supervisory positions. (Pls.' Jt. Ex. 27.)

41. The PBA and the Government are parties to a collective bargaining agreement (the "PBA CBA"). (Ex. 27, pt. II) The PBA CBA came into effect on October 1, 2007. It was set to expire on September 30, 2011. (Pls.' Jt. Ex. 27, pt. II at 54.)

42. The LESU and the Government are parties to a collective bargaining agreement (the "LESU CBA"). (Pls.' Jt. Ex. 27, pt. I.) The LESU CBA came into effect on October 1, 2009, and is set to expire on September 30, 2013. (Pls.' Jt. Ex. 27, pt. I at 54.)

43. Both the PBA CBA and the LESU CBA set forth in detail payment plans for the wages or salaries and benefits of member employees. (Pls.' Jt. Ex. 27, pt. I at 48-50, App. A; Pls.' Jt. Ex. 27 pt. II at 27-32.)

44. Both the PBA CBA and the LESU CBA provide that the Government may reduce the work force through layoffs and set forth the procedures by which the Government may layoff and rehire member employees. (Pls.' Jt. Ex. 27, pt. I at 8-10; Pls.' Jt. Ex. 27, pt. II at 49.)

45. Both the PBA CBA and the LESU CBA contain severance clauses which provide that should any provision conflict with Virgin Islands law it would be deemed inoperative. The remainder

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 17

of the CBAs would still be in effect. (Pls.' Jt. Ex. 27 pt. I at 53; Pls.' Jt. Ex. 27 pt. II at 18 at 60.)

46.   The PBA CBA contains an integration clause which provides that any modification to the CBA must be agreed to by all parties in writing. (Pls.' Jt. Ex. 27 pt. II at 53.)

47.   Both the PBA CBA and the LESU CBA provide that employees shall not strike for the duration of the agreement. (Pls.' Jt. Ex. 27 pt. 1 at 24; Pls.' Jt. Ex. 27 pt. II at 24.)

48.   Both the PBA CBA and the LESU CBA set forth grievance and arbitration procedures that allow for either the PBA or the LESU or their members to adjudicate any dispute involving the interpretation, violation, application, or performance of the CBAs. (Pls.' Jt. Ex. 27 pt. 1 at 13-17; Pls.' Jt. Ex. 27 pt. II at 16-23.)

## B.   **Virgin Islands Fiscal Crisis**

### i.   **Revenue Shortfalls**

49.   In fiscal year[2] 2008, the Government collected approximately $855.5 million in total tax revenues. (Defs.' Jt. Ex. 15 at 3.)

---

[2] For accounting purposes, the Virgin Islands Office of Management and Budget defines the fiscal year as beginning on October 1 and ending September 30. (Tr. 138:5-6.)

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 18

50.  In fiscal year 2009, the Government collected approximately $579.8 million in total tax revenues. (Defs.' Jt. Ex. 15 at 3.)

51.  For fiscal year 2009, the Government projected a deficit in excess of $300 million. (Tr. 153:22–25; 154:1-12.)

52.  To reduce the deficit, the Legislature passed Act No. 7064, which authorized the Governor to borrow up to $250 million.

53.  In fiscal year 2010, the Government collected approximately $603.1 million in total tax revenues. (Defs.' Jt. Ex. 15 at 3.)

54.  For fiscal year 2010, the Government projected a deficit in excess of $275 million.

55.  To reduce the deficit, the Legislature passed Act No. 7174, which authorized the Governor to borrow an additional $250 million.

56.  On September 7, 2010, the Virgin Islands Office of Management and Budget ("VIOMB") prepared and submitted to the Legislature a proposed budget for fiscal year 2011. The proposed budget projected that salary increases called for by several of the CBAs discussed above would cost approximately $31 million. (Tr. 171:6-20.) The proposed budget also projected that total tax revenues would be approximately $747 million and that there

United Steel Workers v. Gov't of the V.I.
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 19

would be a net surplus of approximately $3.5 million. (Tr. 172:1-2; Defs.' Jt. Ex. 15 at 3.)

57.   On November, 2, 2010, the Virgin Islands held elections for the Office of the Governor and the Virgin Islands Legislature.

58.   On December 30, 2010, the VIOMB revised its fiscal-year 2011 budget to project an $82.5-million deficit. This revision reflected diminished expectations of tax revenue stemming from the passage of the federal Tax Relief Act of 2010, and an unanticipated growth in unemployment in the Virgin Islands. (Tr. 168:8-170:11.)

59.   The fiscal-year 2011 budget was again revised on January 28, 2011, to project that total tax revenue would be approximately $701.9 million and that there would be a deficit of approximately $75.1 million. (Tr. 172:23-173:2; Defs.' Jt. Ex. 15 at 3.)

60.   At that time, the VIOMB also projected a deficit for fiscal year 2012 of approximately $131.5 million. (Tr. 172:23-173:2.)

61.   The salaries and benefits of Government employees constitute approximately seventy percent of all Government expenditures. (Tr. 158:22-159:6.)

United Steel Workers v. Gov't of the V.I.
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 20

**ii.  Governmental Responses to Revenue Shortfalls**

62.   In the wake of the projected deficits, from December 30, 2010, to June 21, 2011, the Legislature and the Executive Branch of the Government undertook a number of finance-related measures:

62a. The Legislature passed Act No. 7245, which imposed a marine terminal user's tax of one dollar per cruise ship passenger;

62b. The Legislature passed Act No. 7254, reducing appropriations for the Executive Branch by three percent, or approximately $17.7 million;

62c. The Legislature passed Act No. 7248, which reduced appropriations for the judicial branch by 3 percent, or approximately $1.1 million; increased a tax on all gross receipts from 4 percent to 4.5 percent; increased a tax on hotel occupancy from 8 percent to 10 percent; increased the licensing and related fees for marriages; and increased the liquor-licensing fees;

62d. The Legislature passed Act No. 7258, which reduced various appropriations by a total of approximately $6.2 million;

62e. The Governor line-item vetoed a $31.4 million appropriation to pay for salary increases called for in the CBAs discussed above;

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 21

62f. The Legislature passed Act No. 7260, increasing filing and other fees for the Superior Court of the Virgin Islands;

62g. The Legislature passed Act No. 7266, increasing the fines for traffic violations;

62h. The Legislature passed Act No. 7268, raising the motor-vehicle rental surcharge from $2 to $3.75 per day; and

62i. The Government maintained its limited hiring freeze, sought to reduce energy consumption, limited government-vehicle use, and reduced training and travel expenditures. (Tr. 131:1-132:19.)

63. Despite these measures, by June 21, 2011, the VIOMB still projected a deficit of approximately $17.4 million for fiscal year 2011, a deficit of approximately $90.1 million for fiscal year 2012, and a deficit of approximately $49.9 million for fiscal year 2013. (Tr. 115:12-23; 175:20-23; Defs.' Jt. Ex. 15 at 5.)

64. Throughout this period, the Government met with the Unions on several occasions to explain the fiscal situation and receive suggestions on means to reduce expenditures. (Tr. 258:18-260:4.)

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 22

      **iii. Alternative Cost-Cutting Measures Considered and
          Rejected by the Government**

     65.  Between June 21, 2011, and June 22, 2011, the
Legislature and the Executive Branch of the Government
considered and rejected several alternative cost-cutting
measures, including:

     65a. Layoffs of 600 Government employees, which would
have resulted in annual savings of approximately $30 million.
(Tr. 191:2-9.)

     65b. Elimination of some or all paid holiday leave,
which would have resulted in annual savings of approximately
$1.4 to $1.5 million per paid holiday eliminated. (Tr. 195:24-
196:4.) There are currently eighteen paid holidays recognized by
the Virgin Islands. Thus, elimination of all paid holidays could
have resulted in a maximum annual savings of approximately $27
million. (Tr. 196:12-19.)

     65c. Furloughs of one work day every two work weeks or
eight hours every two-week pay period. This would have
effectively reduced Government employees' net pay by ten
percent, resulting in an annual savings of approximately $35
million. (Tr. 248:11-23; 249:18-21.)

     65d. Workweek reductions under which employees would
work ten hours a day for four days a week. This was projected to

result in annual savings of approximately $3 million due to reduced electrical consumption. (Tr. 242:10-243:12.)

       65e. A gross-receipts tax increase from 4.5 percent to 5 percent. In fiscal year 2010, the Government collected approximately $61 million in revenue from the gross-receipts tax. In fiscal year 2011, the Government projected it would collect approximately $60.9 million in revenue from the gross-receipts tax. Thus, raising the gross-receipts tax to 5 percent could raise revenue by as much as $6.8 million. (Defs.' Jt. Ex. 15 at 3.)

     66.  By June 21, 2011, the Governor exhausted his $500 million statutory borrowing authorization. To secure financing for this borrowing, the Governor leveraged future excise tax revenues to be collected on rum produced in the Virgin Islands. As of June 21, 2011, the Virgin Islands had only been able to make interest payments on this debt. (Tr. 156:8-157:1; 158:5-16; 161:22-162:1; 162:3-5.)

## C.   Virgin Islands Economic Stability Act

     67.  On June 22, 2011, the Legislature passed the Virgin Islands Economic Stability Act ("VIESA"). It was signed into law as Act No. 7261 by the Governor on July 5, 2011.[3]

---

[3] On July 7, 2011, the Legislature overrode several of the Governor's line-item vetoes of VIESA.

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 24

### i.  Legislative Findings

68.  The VIOMB projected that reducing salaries of Government employees by eight percent would save approximately $28 million annually. (Tr. 117:24-118:13.)

69.  In support of VIESA, the Legislature found that "the current global economic crisis" and decreased economic activity in the Virgin Islands placed the Government of the Virgin Islands "in a precarious financial condition . . . ." VIESA, Act No. 7261, preamble.

70.  The Legislature further found that the burden of the "Government Operating budget is overwhelming and unsupportable for much longer . . . ." *Id.*

71.  The Legislature further found that "government employees . . . who have been employed over thirty . . . years, [and] who are eligible to retire from Government service . . . are being paid in excess of forty-seven million dollars . . . annually in salary and fringe benefits . . . ." *Id.*

### ii.  Material Terms of VIESA

72.  Section 4(a) of VIESA provides that

the salaries of all Government employees in the executive and legislative branches shall be reduced by eight . . . percent; in its discretion, the judiciary will voluntarily comply with this section, or request an equivalent reduction in its budgets, or act in alternative ways to achieve the purposes of this section; and no reduction shall have the effect of

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 25

    reducing an employee's salary below twenty-six
    thousand dollars . . . .

VIESA, Act No. 7261 § 4(a). Section 4(c) further provides that

any employees who opted to retire within two years would have

their retirement annuity calculated at the "pre-8 percent

reduction salary rate." VIESA, Act No. 7261 § 4(c).

    73. The eight-percent reduction would come into effect on

July 4, 2011, and expire on July 3, 2013. VIESA, Act No. 7261

§ 4(f)

    74. Section 7(k) of VIESA provides that any member of the

Government Employee Retirement System "who has attained thirty

or more years of credited service completed as of the date of

enactment of this Act shall pay an additional three

percent . . . of their salary into the GERS . . . ." VIESA, Act

No. 7261, § 7(k). Employees with thirty or more years of service

who elected to retire between June 30, 2011, and September 30,

2011, would receive a payment of $10,000. VIESA, Act No. 7261,

§ 7(a).

## II. <u>ANALYSIS</u>

### A. <u>Whether VIESA Violates the Impairment of Contracts Clause</u>

    The USW, AFT Local 1825 and Local 1826, VISNA-CBU, UIW-SIU,

PBA, and LESU (collectively, the "Unions") all claim VIESA

violates the Impairment of Contracts Clauses of the federal

Constitution and the Virgin Islands Revised Organic Act.

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 26

The Federal Constitution provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. CONST. Art. I, § 10, cl. 1. The Revised Organic Act incorporates the federal Contracts Clause, providing that: "No law impairing the obligation of contracts shall be enacted." Rev. Org. Act of 1954 § 3, cl. 6., (codified at 48 U.S.C. § 1561); *WICO, Ltd. v. Gov't of the V.I.*, 844 F.2d 1007, 1009 (3d Cir. 1988) ("[T]he contract clause of the United States Constituion[ is] incorporated into Virgin Islands law by § 3 of the Revised Organic Act . . . .").

"A party seeking to prevail on a Contracts Clause claim 'must demonstrate that a change in state law has "operated as a substantial impairment of a contractual relationship." ' " *Schimes v. Barrett*, 427 Fed. App'x 138, 142 (3d Cir. 2011) (quoting *Transp. Workers Union, Local 290 ex rel. Fabio v. SEPTA*, 145 F.3d 619, 621 (3d Cir. 1998) (quoting *GM Corp. v. Romein*, 503 U.S. 181, 186 (1992))). To determine whether a party has met that burden, the Court must make "three threshold inquiries: (1) whether there is a contractual relationship; (2) whether a change in a law has impaired that contractual relationship; and (3) whether the impairment is substantial." *Transp. Workers Union*, 145 F.3d at 621 (citing *GM Corp.*, 503 U.S. at 186).

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 27

If the Court determines that "a substantial impairment of a contractual relationship has occurred," the Court must then "further inquire whether the law at issue has a legitimate and important public purpose and whether the adjustment of the rights of the parties to the contractual relationship was reasonable and appropriate in light of that purpose." *Id.* (citing *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 242-44 (1978); *Nieves v. Hess Oil V.I. Corp.*, 819 F.2d 1237, 1243 (3d Cir. 1987)). Ordinarily, where the impaired contract is between private parties, "the court will defer to the legislative judgment concerning the importance of the public purpose and the manner in which that purpose is being pursued." *Id.* (citing *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 412-13 (1983)). However, where, as here, the state is a party to the contract, "complete deference to a legislative assessment of reasonableness and necessity is not appropriate because the State's self-interest is at stake." *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 26 (1977).

Here, the Government has stipulated that the CBAs constitute contractual relationships. (Jt. Final Pretrial Order 21-22.) The Government has also conceded that, if any contractual obligation is impaired by VIESA, such impairment would be substantial. (Jt. Final Pretrial Order 20.)

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 28

Accordingly, the Court need only first inquire as to whether VIESA impairs any of these contractual relationships.

### i. Whether VIESA Impairs the CBAs

The cornerstone of a contractual relationship is the protection of legitimate expectations. "Contracts enable individuals [and public entities] to order their . . . affairs according to their particular needs and interests. Once arranged, those rights and obligations are binding under the law, and the parties are entitled to rely on them." *Allied Structural Steel Co.*, 438 U.S. at 245. The United States Court of Appeals for the Third Circuit has explained that:

> The purpose of the Contract Clause is to protect the legitimate expectations that arise from such contractual relationships from unreasonable legislative interference. Thus, we must determine whether there has been a substantial impairment of a contractual relationship by inquiring whether legitimate expectations have been substantially thwarted.

*Transp. Workers Union*, 145 F.3d at 622.

In *Transport Workers Union, Local 290 ex rel Fabio v. SEPTA*, 145 F.3d 619 (3d Cir. 1998), the Third Circuit considered whether a pension plan created legitimate expectations protected by the Contracts Clause. In that case, the plaintiffs challenged a change to their pension plan that required employees to contribute a portion of their earnings to the plan. *Id.* at 620. The Third Circuit noted that the pension plan was created pursuant to a statute which provided that any pension plan

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 29

"would be subject to modification from time to time" by the
Southeastern Pennsylvania Transit Authority's ("SEPTA") Board.
*Id.* at 622. The court further noted that the pension plan itself
"expressly provided that the Board was authorized to amend the
terms of the plan in any manner which it deems desirable." *Id.*
(internal quotation marks and citation omitted). The plan also
provided that SEPTA could reduce or discontinue its
contributions to the pension fund at any time, or even terminate
the plan entirely. *Id.* Accordingly, the court held that "an
employee's reasonable expectation from the Plan contract cannot
include a guarantee that an employee contribution would never be
required." *Id.*

By contrast, in *Buffalo Teachers Federation v. Tobe*, 464
F.3d 362 (2d Cir. 2006), the United States Court of Appeals for
the Second Circuit considered the expectations flowing from
labor contracts between the City of Buffalo and public-sector
employees. In that case, at issue was a wage freeze that
prevented the implementation of a two-percent wage increase
unions had negotiated as part of their labor contracts with the
City of Buffalo. *Id.* at 362. The Second Circuit held that the
labor contracts created a legitimate expectation in the
negotiated wage increases. *Id.* at 368. The court reasoned that
"[t]he promise to pay a sum certain constitutes not only the
primary inducement for employees to enter into a labor contract,

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 30

but also the central provision upon which it can be said they reasonably rely." *Id.* Indeed, the court noted, "[c]ontract provisions that set forth the levels at which union employees are to be compensated are the most important elements of a labor contract." *Id.*

Here, all of the Unions' CBAs expressly provided, in very specific detail, for the compensation of union-member employees. Representatives from each of the Unions testified at the trial that they understood the wage and salary plans in the CBAs to be binding on the Government. Unlike the pension plan in *Transport Workers Union*, each of the CBAs expressly state that they will be binding throughout their duration. The CBAs also expressly prohibit any modification of their terms except by mutual agreement of the parties in writing. Moreover, the Unions made various concessions in the CBAs, such as the promise not to strike or the promise not to negotiate for additional salary increases, in exchange for securing the Government's agreement to the CBAs.

The Government argues that Section 374 of Title Twenty-Four of the Virgin Islands Code ("section 374") eliminates any legitimate expectation the union-member employees might have had in the wage and salary plans contained in the CBAs. Section 374 provides, in pertinent part:

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 31

> [N]o contract or other instrument of agreement between
> an exclusive representative and a public employer
> which contract or instrument requires the
> appropriation of funds by the Legislature shall be
> binding as to the terms requiring appropriations until
> such appropriations are enacted.

V.I. CODE ANN., tit. 24, § 374(h). The Government argues that this

provision allows the Legislature "to 'veto' certain labor

agreements in order to protect the *health, safety, and welfare*

of the citizens of the Territory . . . ." (Gov't Defs. Proposed

Findings of Fact and Conclusions of Law 17.)

In *District 2A, Transport, Technical, Warehouse, Industrial*

*& Service Employees Union v. Government of the Virgin Islands*,

794 F.2d 915 (3d Cir. 1986), the Third Circuit considered the

scope of section 374. In that case, the plaintiff union,

District 2A, and the Government failed to negotiate a wage

agreement after the expiration of a prior CBA. *Id.* at 916.

District 2A and the Government then entered into arbitration,

"pursuant to the impasse arbitration procedures contained in the

Public Employees Relations Act ("PERA"), V.I. CODE ANN. tit. 24,

§§ 361-383 . . . ." *Id.* A three-member arbitration panel

considered the issue and ultimately awarded union-member

employees salary increases and a lump-sum payment. *District 2A*,

794 F.2d at 917. However, despite a proposed bill submitted by

the Governor, the Legislature never enacted any legislation

appropriating the funds necessary to satisfy the award.

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 32

The court held that section 374(h) gave the Legislature "a 'veto' over certain labor agreements consonant with [PERA]'s policy." *Id.* at 918. In reaching this conclusion, the court looked to Section 361 of Title Twenty-Four of the Virgin Islands Code, which provides, in pertinent part:

> The Legislature finds and declares that the Government of the Virgin Islands shall fully accept the principle and procedure of collective bargaining and shall bargain in good faith with valid public employee organizations, subject, however, to the paramount right of the citizens of this Territory to keep inviolate the guarantees for their health, safety, and welfare.

V.I. CODE. ANN. tit. 24, § 361. In light of this declaration of policy, the court held that the Legislature had "reserve[ed] a right of final approval over arbitration awards that require the expenditure of public funds . . . ." *District 2A*, 794 F.2d at 917.

The Government contends that, as in *District 2A*, the Legislature in this case, through VIESA, effectively "vetoed" the wage and salary plans contained in the CBAs. The Government overlooks several key factors. First, unlike *District 2A*, the CBAs at issue here were, and many remain, in full force. It is undisputed that prior to the enactment of VIESA, the Legislature had appropriated the necessary funds to pay the salaries and wages provided for in the CBAs. Indeed, the arbitration award in *District 2A* had never been approved by the Legislature, and thus

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 33

fell squarely within the confines of section 374(h), which
provides that no contract is binding "until appropriations are
enacted." V.I. CODE ANN., tit. 24, § 374(h).

Second, it is far from obvious that the present case even
falls within the purview of the PERA, which, as section 361
makes clear, deals primarily with the process of negotiating
CBAs. PERA allows the Legislature to "veto" the Governor's
approval of a proposed CBA by declining to appropriate funds.
Here, the Unions' CBAs were all negotiated and approved several
years ago, unlike the arbitration award at issue in *District 2A*.
In that case, the Third Circuit relied in part on the fact that
the arbitration award did not "bind the Legislature" because it
was not a party to the arbitration. *District 2A*, 794 F.2d at
918. Moreover, the court's ultimate holding in *District 2A* was
narrowly confined to the facts of that case: "The [PERA] simply
directs the government, in its capacity as an employer, to pay a
salary set by the arbitration panel subject to the Legislature's
final approval." *Id.* at 920. Given the narrow scope of this
holding, it cannot be said the PERA clearly applies to the
present case.

Finally, if the Court were to read section 374 as
permitting the Legislature to veto any labor agreement even
after it had come into effect, this Court would still be
required to determine whether the Legislative action was made

for the "health, safety [or] welfare" of the citizens of the Virgin Islands. If this standard requires less than what is required to satisfy the Contracts Clause, it is unclear how this portion of the Public Employees Relations Act is constitutionally sound. The Court is unaware of, and the Government points to no authority that permits a state to avoid the requirements of the Contracts Clause by enacting a statute authorizing the state to abrogate contracts at will. Such a statute would conflict with the policy behind the Contracts Clauses--that respecting contractual obligations "enable[s] individuals [and public entities] to order their . . . affairs according to their particular needs and interests." *Allied Structural Steel Co.*, 438 U.S. at 245. Accordingly, the Court will assume, without deciding, that if and to the extent that section 374 applies here, it requires at a minimum the same showing necessary under the Contracts Clause.

The Court thus finds that VIESA impaired the CBAs insofar as they contained agreements pertaining to the wages and salaries of union-member employees. As the Government has conceded that any impairment would be substantial, the Court must now address whether this impairment was a reasonable and appropriate response to a legitimate and important public interest. *See Transport Workers Union*, 145 F.3d at 621.

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 35

> **ii. Whether VIESA's impairment of the CBAs is a reasonable response to an important public interest.**

Having determined that VIESA operates as a substantial impairment of a contractual relationship, the Court must next decide whether there is "a significant and legitimate public purpose behind the legislation . . . such as the remedying of a broad and general social or economic problem." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411-412 (1983). If a legitimate public purpose is identified, "the next inquiry is whether the adjustment of 'the rights and responsibilities of contracting parties is based upon reasonable conditions and is of a character appropriate to the public purpose justifying the legislation's adoption.' " *Id.* at 412 (quoting *U.S. Trust Co. v. New Jersey*, 431 U.S. 1, 22 (1977)).

> a. *Important Public Interest*

"The requirement of a legitimate public purpose guarantees that the State is exercising its police power, rather than providing a benefit to special interests." *Energy Reserves Grp., Inc.*, 459 U.S. at 412 (citing *Allied Structural Steel Co.*, 438 U.S. at 247-248 & n.20 (holding that a Minnesota law impaired pension agreements in violation of the federal Contracts Clause when it was aimed at specific employers, and indeed may have been directed at one particular employer planning to terminate its pension plan)).

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 36

The public purpose necessary to withstand Contracts-Clause
inquiry must be important. For example, courts have held that
addressing a fiscal emergency is an important public interest.
*See, e.g.*, *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398,
444-48 (1934) (statute impairing mortgages found to be
constitutional in light of depression-era exigencies); *Buffalo
Teachers Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006) (wage
freeze impairing municipal labor contracts found to be supported
by an important public interest in light of the city's fiscal
crisis). When the public purpose is not significant, state
action impairing a contract has been found to be
constitutionally infirm. *See, e.g.*, *WICO, Ltd. v. Gov't of the
V.I.*, 844 F.2d 1007, 1022 (3d Cir. 1988).

In *WICO, Ltd. v. Government of the Virgin Islands*, 844 F.2d
1007 (3d Cir. 1988), the Third Circuit considered whether a
statute impaired a contract between the West Indian Company,
Limited ("WICO") and the Government of the Virgin Islands. The
contract at issue provided that WICO would give up approximately
half of the thirty acres of land it claimed to own surrounding
the Long Bay area of the harbor of Charlotte Amalie in St.
Thomas, Virgin Islands. *Id.* at 1012. In exchange, the Government
would convey title to WICO for the remaining half of the
property. *Id.* The contract expressly provided that, upon the
satisfaction of certain conditions, WICO could reclaim a

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 37

specified amount of land from Long Bay. *Id.* After the Government
ratified the contract, WICO began dredging operations as part of
its reclamation project. *Id.* at 1013-14. WICO's dredging
operations "created an immediate public uproar." *Id.* at 1014. In
response, the Legislature enacted the Virgin Islands Repeal Act
of 1986, which required approval by the Governor and the
Legislature of any future dredging operations in Long Bay. *Id.*

After determining the contract was binding and
substantially impaired, the Third Circuit addressed whether the
Repeal Act was supported by a sufficient public purpose. The
court noted that the Repeal Act was "addressed to the public
interest in the sense that it provides no benefit to special
private interests . . . ." *Id.* at 1022. However, the court
ultimately held that "abrogating the contract with WICO and
[thereby] retaining title, albeit a heavily clouded one, to the
15 acres of submerged land at issue is not a 'significant'
purpose, and is by no stretch of the imagination a remedy for a
'broad or general social or economic problem.' " *Id.* Thus, the
court concluded, because the Repeal Act was "by its own terms
directed at a single company and a single 15-acre area," it
violated the Contracts Clause. *Id.*

By contrast, in *Buffalo Teachers Federation*, the Second
Circuit found a sufficient public purpose behind a wage freeze
that impaired labor agreements between the City of Buffalo and

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 38

its employees. The court noted that "Buffalo was suffering at

the time, and continues to suffer, a fiscal crisis." 464 F.3d at

368. Buffalo had grown increasingly reliant on aid from the

State of New York to fund its budget, with aid ballooning from

$67 million in 1997-98 to $128 million in 2002-03. *Id.* at 365.

At the time the wage freeze was implemented, Buffalo was

projected to run budget deficits in the range of $76-$127

million for the next two fiscal years. *Id.* Thus, the court

concluded, the statute in question was not passed "for the mere

advantage of particular individuals," but rather because "the

city of Buffalo [was] facing a severe fiscal crisis,

and . . . the crisis cannot be resolved absent assistance from

the state." *Id.* (internal quotation marks and citations

omitted).

Here, the Virgin Islands Legislature enacted VIESA because

of the Virgin Islands' "precarious financial condition." VIESA,

Act No. 7261, preamble. At the time of its enactment, the

Government was projected to run a budget deficit of

approximately $17.4 million for the remainder of fiscal year

2011, a deficit of approximately $90.1 million for fiscal year

2012, and a deficit of approximately $49.9 million for fiscal

year 2013. (Tr. 115:12-23; 175:20-23; Ex. 32 at 5.)

Upon review of the expenditures that contributed to that

deficit, it is undisputed that employee compensation is the

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 39

single largest expenditure of the Government, accounting for
approximately seventy percent of the annual budget. (Tr. 158:22–
159:6.) VIESA applies uniformly to all employees of the
Legislative and Executive Branches of the Government, and
requires the Judicial Branch to make an equivalent reduction in
expenditures.[4] VIESA did not single out any union or other group
of employees for disparate treatment. Moreover, the benefits of
VIESA will not redound to the benefit of any particular interest
group, as it is intended simply to reduce overall expenditures
from the public fisc. Thus, the Court finds that VIESA was
supported by an important and legitimate state interest.

    b.  *Reasonableness and Necessity*

    Ordinarily, courts afford substantial deference to a
legislature's "judgment as to the necessity and reasonableness
of a particular measure." *U.S. Trust Co.*, 431 U.S. at 23.
However, where, as here, the state itself is a party to a
contract, "complete deference to a legislative assessment of
reasonableness and necessity is not appropriate because the
[s]tate's self-interest is at stake." *Id.* at 26. To survive this
less-deferential scrutiny the state must establish "that [it]
did not (1) 'consider impairing the contracts on par with other

_____

    [4] Title 4, Section 72 of the Virgin Islands Code prohibits the reduction
of any Virgin Islands judge's compensation "during his term of office without
his consent." V.I. Code Ann. tit. 4, § 72(c).

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 40

policy alternatives" or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances.' " *Buffalo Teachers Fed'n*, 464 F.3d at 371 (alteration in original) (quoting *U.S. Trust Co.*, 431 U.S. at 30–31).

In *Baltimore Teachers Union, Local 340 v. Mayor of Baltimore*, 6 F.3d 1012 (4th Cir. 1993), the Fourth Circuit considered whether a one-percent reduction in salary of all of Baltimore's employees violated the Contracts Clause. In October of 1991, facing a budget deficit of some $450 million, the state of Maryland decreased aid to Baltimore by $24.2 million. *Id.* at 1014. In response, Baltimore implemented a series of cost-cutting measures, "such as layoffs, elimination of positions, and early retirements." *Id.* In December 1991 the state further reduced aid to Baltimore by $13.3 million. *Id.* Baltimore then implemented a "furlough plan." *Id.* "Under the [furlough] plan, full-time city employees . . . lost the annual equivalent of 2.5 days of pay, or 0.95% of their gross annual salary, and Baltimore saved approximately $2 million . . . ." *Id.*

The Fourth Circuit held that, although the furlough plan was a substantial impairment of a valid contract, it was reasonable and necessary. *Id.* at 1019. The court explained that "[i]t is not enough to reason . . . that the City *could have*

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 41

shifted the burden from another governmental program, or that it *could have* raised taxes. . . . Were these the proper criteria, no impairment of a governmental contract could ever survive constitutional scrutiny." *Id.* at 1019-20 (internal quotation marks and citations omitted). The court noted that Baltimore was "required by law to balance its budget" and that personnel costs constituted a large percentage of its expenditures (for example, "91.8% of the Police Department budget and 82.5% of the Public School budget"). *Id.* at 1020. At the time of the cuts in state aid, the City "was already suffering from the sluggish economy and poor financial management." *Id.* "Indeed, . . . prior to the implementation of the furlough plan, [Baltimore] was approaching the point where it had to begin cutting basic services and initiating the breakdown of government." *Id.* at 1021 (internal quotation marks and citation omitted).

Further, Baltimore had previously considered and tried several alternatives to the wage reductions, such as layoffs, position abolishments, and early retirements. *Id.* at 1020. The court also noted that Baltimore "tailor[ed] the plan as narrowly as possible to meet its unforeseen shortfalls," by making the amount of the reduction "no greater than necessary"; ending the furlough plan when it became clear budgetary shortfalls would not be as drastic as anticipated; and by leaving unaltered fringe benefits, overtime pay, hourly rates of pay, or the

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 42

orientation of pay scales. *Id.* at 1020-21. The Fourth Circuit
thus concluded that the furlough plan did not violate the
Contracts Clause. *Id.* at 1021.

In *Buffalo Teachers Federation*, after finding that a wage
freeze imposed on Buffalo employees was supported by an
important public interest in resolving the city's fiscal crisis,
the Second Circuit went on to consider whether the measure was
reasonable and necessary. First, the court noted that the wage
freeze was imposed "only after other alternatives had been
considered and tried." 464 F.3d at 371. Specifically, a hiring
freeze had been imposed, schools closed, and nearly 1050
employees laid off. *Id.* Second, the court noted that the only
alternatives to the wage freeze were the "elimination of more
municipal jobs and school closures, alternatives which clearly
are more drastic than a temporary wage freeze." *Id.* Third, the
court noted that the wage freeze was temporary--it was to be
revisited "on an on-going basis to assure the freeze's continued
necessity"--and only applied to future wages, not to past wages
or salary due. *Id.* at 371-72. Thus, the Second Circuit held that
the wage freeze was reasonable. *Id.* at 372.

In assessing the necessity of the wage freeze, the Second
Circuit noted that "taxes could have been raised or other
programs and services could have been eliminated or burdened."
*Id.* The court declined to find that these alternatives rendered

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 43

the wage freeze unnecessary for three reasons. First, "[i]t

cannot be the case . . . that a legislature's *only* response to a

fiscal emergency is to raise taxes." *Id.* The court also noted

that Buffalo had already raised taxes and "it is reasonable to

believe that any additional increase would have further

exacerbated Buffalo's financial condition." *Id.* Second, the

court found that there had been no showing as to how the monies

raised by higher taxes would flow to Buffalo. *Id.* Third, the

court found "no need to second-guess the wisdom of picking the

wage freeze over other policy alternatives, especially those

that appear more Draconian, such as further layoffs or

elimination of essential services." *Id.* (citing *Blaisdell*, 290

U.S. at 447–48 ("Whether the legislation is wise or unwise as a

matter of policy is a question with which we are not

concerned.")). Thus, the Second Circuit found that the wage

freeze did not violate the Contracts Clause. *Id.* at 373.

In the present case, VIESA was only enacted after a series

of alternative measures were first considered and tried. The

Government raised taxes on cruise-ship passengers, motor-vehicle

rentals, and gross receipts; reduced appropriations for several

departments and agencies; increased filing fees for local

courts; sought to reduce energy consumption; and borrowed $500

million. Yet, despite these attempts to close the budgetary

gaps, by June, 2011, it was clear that the Government would

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 44

still run a deficit for that fiscal year and was projected to
run a deficit of $90.9 million and $49.9 million for the next
two fiscal years, respectively. With a statutory obligation to
balance the budget, *see* V.I. CODE ANN. tit. 2, § 251,[5] and with
personnel costs accounting for nearly seventy percent of all
Government expenditures, it cannot be said it was unreasonable
or inappropriate for the Government to look to reduce its
employees' wages and salaries as an emergency cost-cutting
measure.

The Unions argue that VIESA was not reasonable and
appropriate because the Government could have obtained these
savings through other means, such as raising taxes, borrowing
more money, implementing furloughs, or layoffs. However, prior
to the enactment of VIESA, the Government had already raised
several taxes and fees but was unable to return tax revenue to

---

[5] Section 251, Title 2 of the Virgin Islands Code, provides:

The purpose of this chapter is to require, as a matter of law,
that: (1) the budget of the Government of the Virgin Islands be
balanced each fiscal year; (2) appropriations in each fiscal year
not exceed the verifiable revenues received; (3) annual deficits
be eliminated that will prevent the accumulation of debt; and (4)
the Government should be current in the payment of its
obligations to employees and vendors. Appropriations for all
other funds shall not exceed the certified average of the prior
two fiscal years' revenues, except to the extent there exists
unobligated balances from prior years available for
appropriation.

V.I. CODE ANN. tit. 2, § 253. This chapter can only be waived by a two-thirds
vote of the Legislature "whenever the Legislature finds that an emergency
exists, natural or otherwise." V.I. CODE ANN. tit. 2, § 255.

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 45

pre-2009 levels. Moreover, the VIOMB still projected a $90.9 million deficit for fiscal year 2012 while assuming gross receipts were taxed at a rate of 5%, instead of the then current 4.5%. (*See* Tr. 116:12-15; 194:25-195:12.) The evidence strongly supports the inference that, since 2008, there has been a significant decline in the tax base and there is no evidence that raising taxes will significantly increase revenue.

Similarly, prior to VIESA, the Government borrowed $250 million in 2009 and another $250 million in 2010 to make up for falling revenue. To date, the Government has been unable to pay off any of the principal amount owed on this debt.

Simply borrowing more is not a readily available solution, as the Government was already required to leverage significant future income streams from excise taxes in order to secure financing for the $500 million in loans. Moreover, as with raising taxes, it simply cannot be reasoned that the Government could have borrowed more. If this were the criteria, "no impairment of a governmental contract could ever survive constitutional scrutiny." *Balt. Teachers Union*, 6 F.3d at 1020.

It is undisputed that the Government could have laid-off workers or implemented furloughs without violating the terms of the CBAs. However, furloughs would have resulted in the same or greater net reduction in pay for Government employees while also reducing the Government's ability to provide basic services.

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 46

(Tr. 197:3-9; 253:18-254:25.) Similarly, the Government would

have needed to reduce its workforce by at least 600 employees to

equal the savings resulting from VIESA. Layoffs of that

magnitude would have a just as severe, if not greater, impact on

the Government's ability to provide basic services. Thus, this

is not a situation where the Government "chose a drastic

impairment over an equally acceptable, more moderate course,"

*Balt. Teachers Union*, 6 F.3d at 1020, or "considered impairing

the . . . contracts on par with other policy

alternatives . . . ." *U.S. Trust Co.*, 431 U.S. 30-31. It is

clear that VIESA was an act of last resort.

VIESA is also narrowly tailored. The eight-percent salary

reduction is to remain in effect only until July 3, 2013. VIESA,

Act No. 7261, § 4(f). The eight-percent reduction will not

reduce any employee's salary below $26,000. *Id.* at § 4(a). As

with the "furlough plan" in *Baltimore Teachers Union*, VIESA

applies only prospectively, not to wages and salary past due,

and in fact permits employees who retire prior to July 3, 2013,

to have their retirement annuity calculated at their pre-VIESA

pay rate. *Id.* at § 4(c). VIESA does not alter fringe benefits or

fundamentally change the orientation of any of the pay scales in

the CBAs. Further, VIESA includes an incentive for employees

with thirty or more years of government service to retire early

in an effort to further reduce personnel costs. *Id.* at § 7.

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 47

Thus, in light of the economic necessity, the lack of viable alternatives, and its narrow tailoring, VIESA cannot be said to be unreasonable or inappropriate. Accordingly, the Court finds that VIESA does not violate the Contracts Clauses of either the federal Constitution or the Virgin Islands Revised Organic Act.

B.    **Whether VIESA Violates the Takings Clauses**

Plaintiffs AFT Local 1825 and Local 1826, VISNA-CBU, and SIU-UIW, claim that VIESA violates the Takings Clauses of the federal Constitution and the Virgin Islands Revised Organic Act.

Both Clauses employ substantially identical language. The Fifth Amendment to the United States Constitution provides, in pertinent part, "[N]or shall private property be taken for public use, without just compensation." U.S. CONST. amend. V. Section Three of the Virgin Islands Revised Organic Act incorporates the Takings Clause, providing, in pertinent part, "Private property shall not be taken for public use except upon payment of just compensation ascertained in the manner provided by law." Rev. Org. Act of 1954 § 3, cl. 8 (codified at 48 U.S.C. § 1561).

A "classic" taking involves "a transfer of property to the state or to another private party by eminent domain." *Stop the Beach Renourishment, Inc. v. Fla. Dep't of Envtl. Prot.*, 130 S. Ct. 2592, 2601 (2010). A "regulatory taking" occurs when a

United Steel Workers v. Gov't of the V.I.
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 48

"government regulation of private property [is] . . . so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). A regulation may violate the Takings Clause "where government requires an owner to suffer a permanent physical invasion of her property"; or where the regulation completely deprives the owner of "*all* economically beneficial use of her property." *Id.* at 538 (internal quotation marks and citation omitted).

As a threshold matter, the Court must first determine whether "a legally cognizable property interest is affected by the Government's action in question." *Prometheus Radio Project v. FCC*, 373 F.3d 372, 428 (3d Cir. 2004) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)). Property interests are not constitutionally created. Rather, protected property rights are "created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law." *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972).

The Supreme Court has held that valid contracts may constitute property under the Takings Clause. *See Lynch v. United States*, 292 U.S. 571 (1934). However, this is far from an absolute rule. *See Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 224–25 (1986) ("[T]he fact that legislation disregards

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 49

or destroys existing contractual rights does not always
transform the regulation into an illegal taking [but] [t]his is
not to say that contractual rights are never property
rights . . . .). Moreover, this rule has recently been called
into question. *See, e.g.*, *Am. Express Travel Related Servs.,
Inc. v. Sidamon-Eristoff*, No. 10-4328, 2012 WL 19382, at *8 (3d
Cir. Jan. 5, 2012) (holding that "the fact that [the plaintiff]
has a contractual right" does not necessarily render state
interference with that right "an unconstitutional taking");
*Buffalo Teachers Fed'n*, 464 F.3d at 375 (expressing "misgivings"
about the continuing validity of *Lynch* and resolving the takings
claim on other grounds); *Pro-Eco, Inc. v. Bd. of Comm'rs*, 57
F.3d 505, 510 n.2 (7th Cir. 1995) ("We read *Connolly* . . . as
effectively overruling, if it had not already been overruled,
*Lynch* . . . ."); *Ohio Student Loan Comm'n v. Cavazos*, 900 F.2d
894, 900-02 (6th Cir. 1990) (distinguishing *Lynch* and holding
that contract rights are not property); *Peick v. Pension Benefit
Guar. Corp.*, 724 F.3d 1247, 1274-76 (7th Cir. 1983) (noting
distinction between "property rights" which are protected under
the Takings Clause and "contract rights" which are not
necessarily protected).

Assuming, without deciding, that a legally cognizable
property interest is at stake here, the next step in the
analysis is to evaluate the nature and impact of the regulation

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 50

in question. "The Supreme Court has avoided expounding any 'set
formula for determining when governmental action constitutes a
taking, instead ' "engaging in essentially ad hoc, factual
inquiries . . . ." ' " *New Jersey v. United States*, 91 F.3d,
463, 468 (3d Cir. 1996) (quoting *Lucas v. S.C. Coastal Council*,
505 U.S. 1003, 1015 (1992) (quoting *Penn Cent. Transp. Co. v.
New York City*, 438 U.S. 104, 124 (1978))). However, the Court of
Appeals for the Third Circuit has identified at least three
relevant considerations: "[1] the economic impact of the
regulation on the claimant"; "[2] the extent to which the
regulation has interfered with distinct investment-backed
expectations"; and "[3] [t]he character of the state
action . . . ." *Am. Express Travel Related Servs., Inc. v.
Sidamon-Eristoff*, No. 10-4328, 2012 WL 19382, at *7 (3d Cir.
Jan. 5, 2012) (quoting *New Jersey*, 91 F.3d at 468 (quoting *Penn
Cent.* 438 U.S. at 124)) (internal quotation marks omitted). With
respect to the third factor, the Third Circuit has noted that:
"unlike a physical invasion of land, a public program adjusting
the benefits and burdens of economic life to promote the common
good ordinarily will not be compensable." *Id.*

    In *American Express Travel Related Services, Inc. v.
Sidamon-Eristoff*, No. 10-4328, 2012 WL 19382 (3d Cir. Jan. 5,
2012), the Third Circuit considered whether a change in New
Jersey law, retroactively reducing the period after which

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 51

travelers checks are presumed abandoned from fifteen to three
years, constituted an unconstitutional taking. The Third Circuit
rejected American Express's claim that its "contractual right to
invest [traveler-check] funds" rendered the legislation a
taking. *Id.* at *8. The court held that "[t]he State has
considerable authority to enact legislation, including the power
to 'affect contractual commitments between private parties.'"
*Id.* (quoting *E. Enters. v. Apfel*, 524 U.S. 498, 528 (1998)). The
court noted that American Express's ability to invest travelers-
check funds had always been circumscribed by the state
abandonment laws. *Id.* The court went on to note that the
disposition of abandoned property had long been recognized to be
"a sovereign exercise of regulatory power," and thus could not
be said to constitute a taking. *Id.* (quoting *Delaware v. New
York*, 507 U.S. 490, 502 (1993) (quoting *Standard Oil Co. v. New
Jersey*, 341 U.S. 428, 436 (1951))) (internal quotation marks
omitted).

In *Buffalo Teachers Federation*, the Court of Appeals for
the Second Circuit considered whether a wage freeze implemented
by the City of Buffalo constituted a taking. First, the court
noted that "the severity of the economic impact of the freeze
and the extent to which it interferes with [City-of-Buffalo
employees'] investment-backed expectations are relatively
small." 464 F.3d at 375. The wage freeze was temporary and

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 52

affected only a small portion of the employees' labor

agreements. *Id.* The wage freeze was also prospective in nature,

and did not apply to wages for labor already rendered. *Id.*

Second, the court noted that the wage freeze was

"uncharacteristic of a regulatory taking." *Id.* The freeze was a

"negative restriction rather than an affirmative exploitation by

the state." *Id.* Third, the wage freeze arose "from a public

program that undoubtedly burdens the plaintiffs in order to

promote the common good." *Id.* (citing *Connolly*, 475 U.S. at

225). Moreover, this public program, designed to help Buffalo

obtain financial stability, "is one which the state had a right

to initiate and regulate." *Id.*

Here, as in *Buffalo Teachers Federation*, the severity of

the economic impact of the wage reduction is small. VIESA is

temporary. *See* VIESA, Act No. 7261, § 4(f). VIESA only applies

prospectively, not to wages due for past labor, and does not

affect fringe benefits or retirement annuities. *Id.* at § 4(c).

Perhaps most significantly, under VIESA, no employee's salary

will be reduced below $26,000. *Id.* at § 4(a). All employees will

continue to receive a salary. VIESA's prospective nature and

narrow tailoring demonstrate its limited interference with

Government employees' investment-backed expectations.

Second, as in *American Express* and *Buffalo Teachers*, the

Government's action is not characteristic of a regulatory

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 53

taking. VIESA does not work an affirmative deprivation of
property. Instead, "the government annuls something," *Buffalo
Teachers Fed'n*, 464 F.3d at 375, namely, the contractual right
to certain payment rates and wage increases.

Third, the wage reduction "arises from a public program
that undoubtedly burdens the plaintiffs in order to promote the
common good." *Id.* The need to preserve fiscal stability is a
well-recognized right of sovereigns. *See id.* Although the net
effect of the wage reduction "may well be to take from Peter to
pay Paul, . . . such burden shifting does not, without more,
amount to a regulatory taking." *Id.* at 376 (citing *Connolly*, 475
U.S. at 223 ("Given the propriety of the governmental power to
regulate, it cannot be said that the Takings Clause is violated
whenever the legislation requires one person to use his or her
assets for the benefit of another.")). Thus, because the
economic impact of VIESA is limited, because VIESA's wage
reduction is not characteristic of a regulatory taking, and
because VIESA is a public program designed to redistribute
burdens and benefits for the public good, VIESA does not violate
either the Fifth Amendment's or the Revised Organic Act's Taking
Clause.

C.  **Whether VIESA Violates the Due Process Clauses**

Plaintiffs PBA, LESU, and AFT Local 1826 claim that VIESA
deprives them of property without due process of law, in

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 54

violation of the Fourteenth Amendment of the United States
Constitution and Section Three of the Virgin Islands Revised
Organic Act.

The Due Process Clauses of the Fourteenth Amendment and of
the Virgin Islands Revised Organic Act are substantially
identical. The Fourteenth Amendment proscribes states from
depriving "any person of life, liberty, or property, without due
process of law . . . ." U.S. CONST. Amend. XIV § 1. Section Three
of the Revised Organic Act incorporates the Due Process Clause,
providing, in pertinent part, "No law shall be enacted in the
Virgin Islands which shall deprive any person of life, liberty,
or property without due process of law . . . ." Rev. Org. Act of
1954 § 3, cl. 1., (codified at 48 U.S.C. § 1561).

   **i.   Procedural Due Process**

It is well established that due process contains both a
procedural and substantive component. *See, e.g.*, *Nicholas v. Pa.
State Univ.*, 227 F.3d 133, 139 (3d Cir. 2000) (citing *Planned
Parenthood of S.E. Pa. v. Casey*, 505 U.S. 833, 846–47 (1992)).
To state a claim for the deprivation of procedural due process
rights, "a plaintiff must allege (1) a deprivation of a
protectable property interest and (2) that the procedures
available did not provide due process of law." *Pence v. Mayor of
Bernards Twp.*, No. 10-3496, 2011 WL 5190124, at *2 (3d Cir. Nov.

United Steel Workers v. Gov't of the V.I.
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 55

2, 2011) (citing *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–34 (3d Cir. 2006)).

Courts have recognized only two types of contract rights that are protected under the Fourteenth Amendment. *See id.* at *3; *Unger v. Nat'l Residents Matching Program*, 928 F.3d 1392, 1397–99 (3d Cir. 1991) (summarizing relevant cases). "[T]he first type arises where the contract confers a protected status, such as those 'characterized by a quality of either extreme dependence in the case of welfare benefits, or permanence in the case of tenure, or sometimes both, as frequently occurs in the case of social security benefits.' " *Unger*, 928 F.3d at 1399 (quoting *S&D Maint. Co. v. Goldin*, 844 F.2d 962, 966 (2d Cir. 1988)). The second type "arises where the contract itself includes a provision that the state entity can terminate the contract only for cause." *Id.* (citing *Cleveland v. Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538–39 (1985) (recognizing a property right created by a for-cause termination provision in an employment contract)).

Assuming, without deciding, that the CBAs created a protectable property interest, the next step in the analysis is the evaluation of the procedures available to protect that interest. Courts agree that there is no due process violation where pre-deprivation notice is provided and the deprivation at issue can be fully remedied through the grievance procedures

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 56

provided for in a collective bargaining agreement. *See Hughes v. City of Bethlehem*, 294 Fed. App'x 701, 705 (3d Cir. 2008) (noting that the plaintiff failed to show she was deprived of due process because the collective bargaining agreement included "an adequate grievance-arbitration procedure"); *Garzella v. Borough of Dunmore*, 280 Fed. App'x 169, 173 (3d. Cir. 2008) (finding no due process violation where the plaintiffs "could and most likely should have used the grievance process outlined in Article 18 of the CBA . . . ."); *Dykes v. SEPTA*, 68 F.3d 1564, 1571 (3d. Cir. 1995) ("Where a due process claim is raised against a public employer, and grievance and arbitration procedures are in place, we have held that those procedures satisfy due process requirements 'even if the hearing conducted by the Employer was inherently biased.' " (quoting *Jackson v. Temple Univ.*, 721 F.2d 931, 933 (3d Cir. 1983))); *Harhay v. Town of Ellington Bd. of Educ.*, 323 F.3d 206, 213 (2d Cir. 2003) ("Courts have held that [a collective bargaining agreement's grievance procedures,] providing for a hearing to contest a challenged employment decision, are sufficient to satisfy due process."); *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 102 (1st Cir. 2002) (pre-deprivation notice ad "the full arbitration afforded by the collective-bargaining agreement w[ere] more than sufficient to satisfy" due process requirements).

In *Adams v. Souzi*, 517 F.3d 124 (2d Cir. 2008) the Court of Appeals for the Second Circuit considered a procedural due process challenge to a "lag payroll" procedure. In that case, a law-enforcement union known as the Sheriff Officers Association ("ShOA") entered into a collective bargaining agreement with the County of Nassau, New York ("Nassau"). *Id.* at 126. "The CBA included provisions setting wage rates and specifying that members of the unions were to be paid on a bi-weekly basis." *Id.* The CBA also outlined grievance and arbitration procedures "that could be used by the union or its employees to adjudicate any dispute between the Union or employee and the County with respect . . . to the meaning, interpretation or application of [the CBA]." *Id.*

Two years after the CBA went into effect, Nassau announced a plan to implement a payroll lag as a means of avoiding layoffs. *Id.* The announcement was made approximately one week before the payroll lag was to come into effect. *Id.* Under the payroll lag, "ten days of pay of each union member would be deferred over the course of ten bi-weekly pay periods, and the deferred pay would be returned when the union member separated from service with [Nassau]." *Id.*

The plaintiffs in that case, members of ShOA, challenged the lag payroll procedure as, among other things, a violation of procedural due process. The Second Circuit dismissed this claim,

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 58

noting that ShOA and its members had the right under the CBA to

arbitrate any dispute involving the meaning, interpretation, or

application of any provision of the CBA. *Id.* at 128. The court

explained that:

> We have held on several occasions that there is no due
> process violation where, as here, pre-deprivation
> notice is provided and the deprivation at issue can be
> fully remedied through the grievance procedures
> provided for in a collective bargaining agreement.

*Id.* (citing *Harhay*, 323 F.3d at 213; *Narumanchi v. Bd. of*

*Trustees of Conn. State Univ.*, 850 F.2d 70, 72 (2d Cir. 1988)

(finding due process was satisfied "by the pre-deprivation

notice and hearing rights provided in the grievance procedures

under the [collective bargaining agreement]"); *Wojcik*, 300 F.3d

at 102. The court first held that there was sufficient pre-

deprivation notice as ShOA was notified of the pay lag procedure

"more than a week before it was to be implemented and more than

three weeks before the lag would first have been reflected in

plaintiffs' pay checks." *Id.* at 128.

Second, the court held that "The Due Process Clause is

implicated only when plaintiffs can establish that the grievance

procedures in a collective bargaining agreement are an

inadequate remedy." *Id.* The plaintiffs countered that the

arbitration procedures were inadequate because "there was no

bargaining relationship concerning the lagging of

payroll . . . ." *Id.* The court found this argument wanting

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 59

"because the only potential source of the plaintiffs' alleged right not to have their pay lagged is the CBA." *Id.* The court noted that there was no federal or state constitutional provision or law conferring a claim of entitlement to the benefit the plaintiffs sought. *Id.* at 128-29. Therefore, the protectable property interest arose from the CBA itself, and as a result "the CBA's grievance procedures were applicable." *Id.* at 129.

Here, as in *Adams*, the Unions' had ample pre-deprivation notice. Prior to the enactment of VIESA, the Government met with the Unions to discuss its financial situation. Moreover, VIESA was set to come into effect twelve days after its enactment, and the union members would not have felt its effects until some time after that.

Also as in *Adams*, the Unions' CBAs set forth arbitration and grievance procedures under which the Unions or any member could adjudicate any dispute involving the meaning, interpretation, or application of any provision of the CBAs. The only potential sources for the Unions' claims not to have their pay reduce are the CBAs. There is no federal or state constitutional provision or law guaranteeing that union members will be paid at certain rates. *See Adams*, 517 F.3d at 128 ("There is no federal or state constitutional provision or law requiring that governmental employees such as plaintiffs be paid

United Steel Workers v. Gov't of the V.I.
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 60

100 percent of their wages in every given pay period.") Thus,

the arbitration and grievance procedures in the CBAs are

available here. The PBA, LESU, and AFT Local 1826 have neither

alleged nor shown that those procedures were inadequate.

Accordingly, they have failed to make out a claim for a

procedural due process violation.

**ii.  Substantive Due Process**

In a case challenging a legislative act, as here,

substantive due process demands that the act withstand rational-

basis review. *Id.* To withstand rational-basis review, a statute

must "(1) [be supported by] a legitimate state interest that (2)

could be rationally furthered by the statute." *Am. Express

Travel Related Servs., Inc. v. Sidamon-Eristoff*, No. 10-4328,

2012 WL 19382 at *3 (3d Cir. Jan. 5, 2012) (citing *Nicholas*, 227

F.3d at 139). The rational-basis test requires significant

deference to the legislature's decision-making and assumptions.

*See Sammon v. N.J. Bd. of Med. Exam'rs*, 66 F.3d 639, 645 (3d

Cir. 1995). "[T]hose attacking the rationality of the

legislative classification have the burden 'to negative every

conceivable basis which might support it.' " *FCC v. Beach

Commc'ns, Inc.*, 508 U.S. 307, 315 (1993) (quoting *Lehnhausen v.

Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)).

The plaintiffs argue that VIESA was arbitrary and

capricious, and contend that it was not supported by any

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 61

legitimate state interest. However, as discussed above, VIESA is supported by not merely a legitimate, but an important state interest in obtaining fiscal stability for the Virgin Islands. Further, VIESA was enacted only after a host of alternative measures were considered and tried. It is limited in scope, applying only prospectively and only for two years. Given the severity of the Virgin Islands' fiscal problems, and the narrow tailoring of VIESA, the plaintiffs have failed to meet their burden of rebutting every conceivable rational basis.

### III. CONCLUSION

The several Unions, their numerous members, and the Government have long been thrown together in a relationship that like many forced, though necessary, relationships, at times has been amicable, adversarial, combustible and laden with suspicion. The dynamic that VIESA adds to that relationship is an exacerbation of the adversarial, combustible, and suspicious inclinations of the stakeholders. It is easy to see why.

The Unions negotiated a set salary for their members-- Government employees. Understandably, the Union members' spending habits and quality of life are dictated by their salary expectations. The eight-percent salary reduction that VIESA dictates clearly works a severe hardship on many employees.

At the same time, the Government, faced with revenue shortfalls and a high level of expenditures, found itself on the

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 62

horns of a dilemma. It could honor the obligation to pay the

negotiated salaries, while adding to a burgeoning debt.

Alternatively, it could choose not to honor the salary

obligations and focus instead on restoring a manageable fiscal

balance. It opted for the latter option. That choice ignited an

already combustible relationship.

The ensuing litigation has unearthed an abundance of

recrimination and defenses. Indeed, the distrust and suspicion

echoed by the Unions was readily apparent in the testimony of

their representatives suggesting that a remarkably bright,

surplus-laden economy was forecast prior to the 2010 election,

only to have that prediction recast in the months immediately

following the election to one that was decidedly gloomy, dark,

and deficit-laden. (*See, e.g.*, Tr. 90:14-18 ("And that's what

make [*sic*] it so ironic, because it was all well prior to [the]

election that [the Governor] agreed, that he signed the contract

and we're going to be--get paid right after [the] election; but

after that, no communication with us when he find [*sic*] out he

couldn't pay.")) The Government defends its action as required

by the economic realities with which it was confronted.

In the midst of this conflagration, the Court is called

upon to decide a significant constitutional legal issue. While

undertaking this task, the Court is not unmindful of the

hardship imposed by an eight-percent diminution in salary. This

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 63

circumstance is even more poignant as many workers are in a dire situation not of their own making and through no fault of their own, which may require countless sacrifices and deprivations. Yet, the Unions' argument that the eight-percent reduction creates a breach of a Constitutional imperative--the Contracts Clause--is legally wanting. That deficiency is fatal to the Unions' claims.

It is axiomatic that the Court is required to follow binding precedent. *See Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of this Court has direct application in a case . . . the [lower court] should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.") That precedent dictates an outcome different than what is urged by the Unions.

Notwithstanding the optimistic pre-election economic forecasts, the Virgin Islands' current financial situation is precarious and has been for several years. Indeed, it is difficult to construe the borrowing of half a billion dollars for operating expenses as anything other than portending a Virgin Islands economy that subsists on shaky financial ground. Given that circumstance, and the numerous other obligations of government, the Constitution does not require a specific solution, nor does it foreclose the solution chosen by the

*United Steel Workers v. Gov't of the V.I.*
Civil Nos. 2011-76, 2011-77, 2011-78, 2011-79
Memorandum Opinion
Page 64

Government. Rather, Contract-Clause jurisprudence has long recognized that while an impairment of contract may be a part of a government's financial measures, that impairment is not necessarily constitutionally infirm. What is required to pass constitutional muster is a legally deliberated approach prior to the abrogation of any contract. The evidence adduced at trial demonstrates that, prior to the enactment of VIESA, the government undertook precisely such an approach. Accordingly, and for the other reasons outlined above, the court will dismiss the plaintiffs' claims alleging violations of the Constitution and the laws of the United States.

An appropriate judgment follows.

S\_____

**Curtis V. Gómez**
**Chief Judge**